The first case for argument this morning is 17-2126, Seadrill Americas v. Transocean. Mr. Rees. May it please the Court. I'd like to begin by addressing the Board's findings on anticipation in this case. The Board's finding that the Lund structure, if it were located within 20 meters of the seabed, could reach the seabed is in fact a finding for anticipation in this case. It is. Because these are apparatus claims. Where we think the Board went wrong was its continued analysis where it faulted Lund. It found it deficient because Lund didn't have an expressed disclosure of reaching the seabed with the second hoist or that it didn't have, in the Board's words, a scenario where it could be reached. Did you ever present evidence that the Lund patent can operate on a drillship that's within 20 meters of a seabed? You made arguments about implicit disclosure. Did you ever present specific evidence of that? We presented evidence of that. We had testimony from Robert Schaaf, and I believe that's mentioned in the reply brief, that you could reach the seabed. He testified, for one thing, that he had been on ships where the drilling deck was located within 20 meters of the seabed. So you put over evidence. The Board found your evidence was insufficient. It did. And it did because it found that there really wasn't a teaching that you could lower the tubulars to the seabed from the second drilling hoist of Lund. And the error in that is that it doesn't matter. The Lund structure, the Board found that the Lund structure, if you located it within 20 meters of the seabed, could reach the seabed, and that's sufficient for anticipation under the In re Schreiber rule. So even if Lund doesn't say, locate this within 20 meters of the seabed, it still anticipates because it's a claimed use. Just like in In re Schreiber, the popcorn container lid that was issued there, the prior art showed it on an oil can. There was no mention in the prior art that, hey, you could also use this. How do we know that Lund was ever used in these shallower waters within the 20 meters? Your Honor, I don't believe that. I mean, this is anticipation. It's a factual finding about what the reference discloses. And the Board's read it one way. You want to read it the other way. But it seems just as likely, or maybe not just as likely, but possible that Lund was never used in shallow waters within 20 meters. And if that's the case, then it wouldn't anticipate, right? Well, I would disagree with that, Your Honor. I mean, it's not the point that Lund ever had to have been used in 20. Maybe it was never used in 20 meters of water. The point is it was capable of being used within 20 meters of water. So just like in re Schreiber. That doesn't sound like enough to me to show that it actually disclosed this element. The claimed element here is a derricks with a first drawworks, second drawworks, and a transfer mechanism. That structure is disclosed. I understand you don't want us to find that the seabed is kind of having any patentable weight. But if we disagree with you on that, then Lund has to explicitly show that it could go to the seabed or it has to be inherent in Lund. And it doesn't explicitly show that. I think you agree with that. And I think your argument is that it has to inherently do that if it's placed within 20 meters. But we don't ever know if it could be placed within 20 meters. It has to be inherently capable of doing that. And there's no reason why the Lund structure couldn't be placed within 20 meters. That was never challenged that for some strange reason you couldn't mount it 20 meters from the seabed. The board in this case found that if Lund were placed within 20 meters, it could reach the seabed with a second hoist. And that should be sufficient because it goes to capability. It doesn't have to disclose it directly. If it were a method, if these were method claims and they said a method for lowering tubulars to the seabed, and Lund shows what it shows using the second hoist to connect strings of tubulars together, it could be that you could perform that method without ever going to the seabed. And so if it was a claimed method for going to the seabed, we would probably agree with the board's analysis. But here there's no doubt. This can go 20 meters below the deck. If it were 20 meters from the seabed, it could reach the seabed. It doesn't matter whether it was ever actually done. That's the lesson from N. Ray Shriver. I'm looking at 24 of your blue briefs, and you say that the patents in suit must anticipate under the rule that that which infringes if it's later would anticipate if it's earlier. Did anyone ever argue that a device using the one prior patent would infringe? Would it fringe? Yeah. I don't know that we ever argued that it would infringe, Your Honor. It would be impossible. It would be possible to infringe, yes. Well, but there's no dispute Lund issued before the patents in suit, right? Right. So it couldn't possibly infringe. Well, it would anticipate. So like I said, we think everything is answered in the N. Ray Shriver case. We do. We don't think that Lund has to actually say go to the seabed. It just has to show something that's capable of it, and it would be capable within 20 meters. So with that, let me turn. Are there any further questions on anticipation? We just think that the court kind of confused a method claim versus an apparatus claim when it analyzed this. On to obviousness. In this case, there's no doubt that. Transocean presents a list of additional, since we're going to obviousness, a list of additional evidence it presented in this case that wasn't present in the other Transocean case, discussing secondary considerations. That's at 26 of the red brief. Do you contest that the PTAB in this case considered not only the prior Transocean evidence but also this additional evidence in making its determination? In making its determination? It wasn't very clear from what, in my read of the PTAB's decision, whether they considered it or gave it a great deal of weight. That evidence was sort of presented just as is. There was no expert testimony. There was no sponsoring witness. It was nothing like that. It was just simply a list of documents that were provided by Transocean. The PTAB's decision focused on certain documents that I guess it found more relevant than others. As to that list of documents that you're referring to, I really don't know exactly what the PTAB did with it unless they discussed it, expressing their opinion. Are there any SAS issues in this? SAS, I'm sorry? The Supreme Court's SAS institute regarding potentially uninstituted claims or grounds. I don't believe so, Your Honor. The court, all the grounds that we wanted instituted were, in fact, instituted. So as to obviousness, Sedrill believes that the evidence of obviousness is just overwhelming here, and it can't be outweighed by any amount of secondary considerations in this case. I mean, it's not really in dispute that these were all familiar elements, that they're assembled in known methods, that they are used. How does this differ from Transocean 2, then? It differs greatly from Transocean 2. In terms of the prima facie case of obviousness? The secondary considerations are even arguably stronger here. They're not weaker here than they were in Transocean 2. No, I disagree with that. I think they're much weaker here than they were in Transocean 2, much weaker. Because? Well, for one thing, in Transocean 2, they presented the patent to the plaintiff, presented seven categories of secondary considerations. In this case, they presented many of the same categories. But here, they were rejected. And probably the biggest one is their expert witnesses. In Transocean 2, the jury heard from two expert witnesses dealing with commercial success on things like increased day rates and things like this. All of that evidence was rejected when it was submitted here. In this case, the board specifically found that Transocean's evidence, that their experts were not credible, that they were contradicted by the evidence available, and that their analysis was flawed. It wasn't even considered here. So you can take that whole section of commercial success that was present in the Transocean 2 case, and it's gone. Do you contest? My recollection is that the competitors in the field said initially, this won't work, and effectively ridiculed it, and eventually said, in some fashion, we need to adopt this. Is that a fair summary? I do not believe that's a fair summary, Your Honor. I think that what happened here was, if you look at the evidence for what you're suggesting, whether there was industry skepticism. Here, there was no. I'm looking at JA 129 and 30 specifically. I don't have that in front of me, Your Honor. What specific are you referring to? I'll find it for you. Well, in any event, while I'm looking for this, the board in this case specifically found that. I'm sorry, 6129. 6129, that's a JA? That's the appendix site? Yes, sir. What I have is the appendix site. So you're citing to the board's decision? I'm citing to an article which begins, dual activity drilling turns in 20 to 40 percent time saving. 6129 in the appendix. Okay, 6129. I don't have that right in front of me. You didn't bring the joint appendix with you? I brought it on a laptop, Your Honor, and I don't have it instantly available. So my apologies for that. You talked about the record with you when you don't have a copy of the joint appendix in front of you. You know, Your Honor, that's a good point, and the next time I will make sure that I have the appendix. But I do know what you're talking about. And the problem with efficiency arguments in this case is that there was no expert testimony to put them in any kind of context. As we've pointed out, when the board rejected the expert testimony in here, you can analogize the findings on efficiency to the findings on, say, market share. To just simply say that you have 5 million in sales doesn't say anything for secondary consideration purposes. There's case law in it. We cite it in our brief that in order to have it, you've got to make sure that it's in context. 5 million in sales by itself doesn't mean anything unless you place it in the context of market share, unless you place it in the context of, you know, increased sales, unless you place it in the context of markets. Do you deny that Rigg Designs previously that claimed dual drilling capabilities without the pipe transfer ability in deepwater drilling were either never built or didn't achieve commercial success? We don't have any evidence that they were built with the pipe transfer mechanism. You know, there were certainly dual Rigg Designs. And we believe that they must have had some way of transferring pipes, of course. But whether they were commercially successful or not, we think that they were successful. For example, we presented evidence in here of the Chevron S-59 Rigg. That was an actual Rigg that was used in the industry, and it goes back to the 1960s, and it had the dual drilling capability. Now, it doesn't specifically show in the reference that we have that it had the pipe transfer means. But there's no reason to think an actual Rigg that was existing and in use from the 1960s was not commercially successful. We don't think the board had sufficient evidence in front of it to make findings as to the commercial success of these Riggs, and they existed. Okay, you're well into your rebuttal, so I don't want to hear from the other side. Then at this point, I'll sit down. Thank you. Thank you. May it please the court. Do you agree with the PTAB and the C-drill that Claim 30 of 781 is represented? Yes, for most of the issues before the court today. Do you agree that Lund and Horn together teach all the elements of the patent and suit, and that a motivation to combine exists? Personally, no, but for the purposes of this appeal today, that is assumed. Okay. C-drill argues in the reply brief that your expert testified at JA 8354 that he had been on Riggs that had 30 to 40 feet between the seabed and the drill floor, and that sufficient to find Lund's tubular members would reach the seabed floor. What's your response to that? First, as pointed out by counsel, it was raised first time in the reply brief, not in the opening brief, and so it should be considered waived. If considered, that description never ties the 30 to 40 feet to any particular type of rig, much less the rig in Lund. The evidence of the rig in Lund is it is consistent with the type of operation that would have a drill floor suspended above another level of equipment, where the wellhead and other equipment would be, and then suspended above the sea by an air gap. There is no testimony or evidence in the Lund situation of what that distance would be if it would ever be within the capabilities of a light Lund preparation hoist. Do you have a case site that lets us rely on secondary considerations in prior cases like Transocean to save you some work? There is a general principle, stare decisis. I understand, but do you have a case site? No, other than what we put in the briefs related to the general concept, but no to the specific facts in this case. We do not have a spot-on decision, but the general concept is the same in that here we have essentially the same patents, same prior art combinations, and we have the same record. We have the same subset of record that was considered in the first Transocean. Is there any evidence on record on how far your patent's tubular string can be lowered beyond the 20 meters claimed in Lund? In Lund? Beyond that. There is none within Lund. No, no. Is there any record on how far your patent's tubular strings can be lowered beyond that 20? There is discussion generally that these are operating in offshore, which means typically in offshore if you have something that is used with drilling, it not only needs to go through that air gap and through the waters, which are usually hundreds or thousands of feet, but then it goes into the well itself and typically go down thousands of feet into the earth. And so the capabilities between a drilling draw works and a preparation hoist are known in the industry. It was the reason why Lund described the two differently in difference by capabilities. And even when you look at the drawings in Lund, the drilling draw works is much larger than the draw works used for the preparation hoist, a structural difference. In the red brief, you say that PTAB improperly relied on certain evidence because the exhibits weren't properly explained in proper detail by Sea-Drill. Give me a little bit more on that argument. Are you arguing harmless error because you're not cross appealing the PTAB's decision or what? The PTAB went against its own rules and relying on evidence that was not fully described. In this situation, it's not necessary for this court to reach a conclusion one way or the other on that issue to affirm the decision below. To affirm the decision, the court is able to look at the entire record. And that's one thing that Sea-Drill would have this court focus on just the facts that were found by the board as supporting non-obviousness. But in a substantial review for substantial evidence, this court is empowered to canvass the entire record, including all of the facts that were either discounted or ignored by the board in its decision. What about NRA Schreiber? Do you argue, I'm assuming, that it is distinguishable from the case here? Correct. Also. So NRA Schreiber is used to say that it's an intended use that... It's capable. It's capable of. The difference is that, well, first, Schreiber, with respect to intended use and capability, usually intended use is directed towards the invention as a whole, not necessarily an element that we're focused on here, in a combination. The question really is whether to-the-sea bed is a functional limitation of structure. In many of the claims here, and this gets to the difference between which claims are representative, many of the claims here are means plus function, which statutorily the to-the-sea bed is a functional limitation that will be used to define the structure. In the other term, tubular advancing station, the board specifically construed that as equipment capable of going to the seabed. So, again, it is a functional limitation that will help define the structure. That is one of the differences between that and Schreiber. Another difference is another factual issue that this board may rely on and was used by the board to distinguish Lund from the present invention, and that is the intervening structure, a point that's hardly raised, hardly mentioned in the briefing by Sea Drill and wasn't addressed here today. As evidence was presented by Transocean's expert and its references, Lund describes having structure that may prevent it from even going 20 meters. That structure is the wellhead and equipment that sits on a platform. Did the board rely on that fact? It did. Do you know where? It does so in its very first analysis on page 26 and 27. It goes through and talks about how Patnoe provided evidence regarding structures that are above the water that would prevent it from going down to the water, much less the seabed. And based upon that, it found that Lund was describing interference with structures above the waterline or on the rig itself. So this isn't an inherency case. It's a failure to prove case, right? This is an inherency case, but it is incumbent upon Sea Drill to be able to prove, to convince the board, that the preparation hoist in Lund would necessarily reach the seabed in its normal operations. In its normal operations, as described in Lund and supported by the testimony of Transocean's expert, there would be intervening structure that would prevent it from reaching the water, much less the seabed. Sea Drill has never explained how that intervening structure would be avoided and hasn't provided any examples or evidence to that. So the board was left with the only evidence before it of intervening structure that would prevent it from going to the seabed, which prevents Sea Drill from meeting its burden of showing that it necessarily goes to the seabed in its normal operation. Can I take you back to obviousness? Yes. I mean, I know we affirmed a finding of no invalidity in Transocean 2, but that's a different standard, right? I mean, in there, they had to meet a clear and convincing standard. Here, we're just on a preponderance standard, so it should be easier to show obviousness. Why can't, even if we accept your secondary consideration, we find that this is just obvious as a matter of law? Because these are really two very close, strong references that disclose every single thing. It's not a five or six reference case. You don't need to come up with ordinary creativity to combine them or reach out to things. Everything is in them, and they're from the same exact sphere. I mean, why doesn't that meet a preponderance standard of showing invalidity here? Certainly. The burden of proof does not affect this court's review for substantial evidence. Sure, but obviousness is ultimately a question of law. Correct. So we get to review that de novo. And that's what I mean. We don't have to upset the board's findings of commercial success and the like. We can accept them, but we can still determine that this is such a strong prima facie case of obviousness that even accepting this secondary evidence doesn't overcome it. I mean, given the strength of these references and the minimal advance over the prior art made by this patent, why isn't it just obvious? Jerry. Addressing that final issue, there is within the court's finding of objective evidence of non-obviousness a weighting factor that the weight of that is stronger than the weight of the prima facie case. And so that is an issue that the court looks at for substantial evidence to support. And the burdens of proof do not affect that. Well, I'm not so sure that I agree with that. I mean, I think you're suggesting that we can't overturn that unless we find a lack of substantial evidence. But we clearly can accept commercial success and still find, just as a matter of law, a skilled artisan would have found this obvious based upon the references alone. It could be so obvious that you could have made hundreds of millions of dollars, which clearly isn't in the record, but still the advance was so minimal that it would have been obvious at the time. We can do that, right? Not in this case. Why not? There is evidence of almost $100 million in royalties collected on licensing of this invention. There is evidence... Where is that? I mean, the board didn't seem to rely on that in its commercial success analysis. That is for the licensing aspect, which the board discounted because it felt that the litigation tainted it. Well, if the board didn't think the evidence is reliable, certainly we're not going to rely on it, or I'm not going to rely on it. In this case, you're able to. Well, you're arguing to me, but again, you're not addressing the premise of my question, which is I accept the board's findings on commercial success. You can amplify them. I don't think they're particularly strong findings. I don't think there's particularly strong evidence of commercial success. But set that aside. Assume it's the best commercial success, the best secondary considerations we've ever seen. And even if that's true, if the references, the two references, are so close and the advance over the prior art is so minimal, why wouldn't we still find it obvious? That's why we have secondary considerations. Because hindsight... So you're basically telling me any time a fact-finder makes a finding of non-obviousness based on secondary considerations, we can't disregard... Not disregard, but we can't say, despite that, it's still obvious as a matter of law. Under a substantial review, if they meet a threshold level, if they meet a threshold level of a nexus to the invention and they show that the industry, as the board found here, moved the industry... So your position is, let me just make sure I'm clear, is if there's a finding of secondary considerations, there's a nexus in all that, the trial court or the fact-finder makes that finding, that we're prevented as an appellate court on a legal issue that's entirely de novo from deciding it's obvious as a matter of law. And are you conceding obviousness? I'm not. And not conceding that the Prima Fasci case is strong. And that's not an argument that's been made by Cedril... Well, has been shown by Cedril here. There were arguments below to indicate why it wasn't strong. But wait, we kind of slid through this in your discussions with Judge Hughes, but did you say that the weighing of the Prima Fasci case in secondary considerations, that that's a question of fact rather than a question of law? And if so, do you have any case to support that conclusion? In the Samsung v. Apple case, there is implicit within there that there is the weight of the evidence is generally considered a fact issue. And it is difficult to disturb... I don't recall what you're referring to, but you just started by saying implicit. So does that mean that they said it's a question of fact or that they did not say it's a question of fact? I do not recall the specific language. But in that case, similar to this, where you have fact findings that have to be assumed from the decision below, it makes it very difficult to overturn it as a matter of law. There may be the case, but this is not the case. It certainly is the case. It's much easier to do when there are not as many or as significant of secondary considerations in the case. But in a case like this, as in the Transocean 2 case noted, it's very rare that we have a record with this extensive evidence of non-obviousness. Well, the record's a little different, though. The board threw out most of the evidence that you relied on in Transocean 2. In reviewing an agency decision, you look at not only the facts relied on by the board, but the entire record. So the record before this court includes those facts that the board ignored or discounted. You don't even have to convince us that the board was incorrect in throwing it out, though. No. When looking for substantial evidence... We didn't rely on evidence that's not in the record, that wasn't allowed in the record. It was in the record. It was presented to the board. And the board didn't rely on it. And we have cited it, yes, and we have cited it here. There was other things that we did not cite, but we cited a number of things in our record that were not specifically addressed or relied upon by the board. And that provides additional evidence this board can rely upon. Granted, the evidence that was cited by the board is more than enough to affirm the decision. We have competitors' internal memos that are praising either the... tying it directly to the patents or the commercial embodiment with the dual-activity feature that the record indicates is shorthand, at least in the context of these memos, to the invention itself. Praising it, giving it value, indicating it's a must-have feature that must be incorporated because of customer demand. That is the essence of objective evidence of non-obviousness. And based upon that... Time? Yes. Final thought? No, that's my final thought. Thank you. Thank you. Thank you. May it please the court, I just have a couple of responses to that. On the issue of whether you could reach the seabed from Lund, we think that it's pretty clear. The argument here to the seabed function is purely functional. It doesn't change the structure of the drawworks first. And as counsel pointed out, that, yeah, some of these claims are in means-plus-function format. And in means-plus-function format, the means is still claiming a structure. And what the board found was that that structure was a drawworks. Simply put, a drawworks. And that claim construction is not on challenge in this appeal. The second preparation waste, which is what it's called in Lund, has a drawworks. So a drawworks is a drawworks. That's an anticipatory structure. So even if we give weight to the seabed stuff, if you put that structure within 20 meters of the seabed, then you could reach the seabed. Arguments about things like air gaps, there's no air gaps in the claims. Counsel said you have to look at the claim as a whole, the invention as a whole. Well, the invention as a whole is essentially a derrick, a first drawworks, a second drawworks, a transfer means, arranged on a drill floor. That's the invention as a whole. That invention as a whole is described in Lund, and you could certainly locate it in a location where it could reach the seabed. So I think that argument that it has to be a bigger drawworks, I mean, how much bigger would it have to be? I think all those arguments really just are not, don't comport with the record here. As far as the normal operations, the normal operations of Lund is to raise and lower a series of pipes with the drawworks. That's the normal operation. So in 20 meters of water, under its normal operation, it could go to the seabed. It's to say that, well, it's going to hit something or there's going to be something in the way. That's not part of the normal operations described in Lund. So it appears I'm out of time. If there's any questions. Thank you. Thank both sides in case it's submitted.